RODERICK C. HOAK AND CORNELIA HOAK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; DOUGLAS F. ANNINGTON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hoak v. Commissioner
Docket Nos. 11102-82, 26684-82.
United States Tax Court
T.C. Memo 1986-358; 1986 Tax Ct. Memo LEXIS 256; 52 T.C.M. (CCH) 123; T.C.M. (RIA) 86358; August 6, 1986. Arnold V. Plum, for the petitioners in docket No. 11102-82. Dante G. Bertani (specially recognized), for the petitioner in docket No. 26684-82. Edward J. Laubach, Jr., for respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined deficiencies in petitioners' income tax and additions to tax as follows: Addition to Tax
Petitioners
Year
Deficiency
Section 6653(b) [1]
Roerick C. Hoak
1974
$50,116.89
$29,894.00
and Cornelia Hoak
1975
20,029.56
10,014.78
Douglas F. Addington
1974
211,720.00
[2] 122,102.00
*257 After concessions, the issues remaining for decision are: (1) whether petitioners had unreported income as determined by respondent; (2) whether petitioners Roderick C. Hoak and Douglas F. Addington are liable for additions to tax under section 6653(b); and (3) whether the statute of limitations on assessment has expired with respect to petitioners Rederick C. and Cornelia Hoak for the taxable year 1974. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations and exhibits attached thereto are incorporated herein by reference. Petitioners Roderick C. Hoak and Cornelia Hoak, husband and wife, resided in Elizabeth, Pennsylvania at the time of the filing of *258 their petition. They reported their income and expenses for 1974 and 1975 on the cash basis and filed joint income tax returns for such years with the Internal Revenue Service Center in Philadelphia. The 1974 return was filed on May 2, 1975 pursuant to a timely application for an extension of time for filing. Petitioner Douglas F. Addington, resided in North Huntington, Pennsylvania at the time of the filing of his petition. He reported his income and expenses for 1974 on the cash basis anf filed a return for such year as a single person with the same Service Center. Mr. Hoak has been involved in salvage work since he was eight years old. His formal education ceased with the sixth grade. Mr. Addington has also been in the salvage business for many years. He is completely illiterate, being able to read and write only his name. From the record as a whole, however, it is apparent that in spite of his lack of an education Mr. Addington possesses an unusual ability for operating businesses. Hoak and Addington first met in 1973. At that time, Hoak had a contract with Liberty Vehicle Leasing, Inc. (Liberty) to gather waste materials from a mill belonging to U.S. Steel. Addington *259 had a dump and a permit under which waste materials could be dumped and any usable scrap metal could be removed therefrom. With Hoak's contract and Addington's dump and permit, they formed an informal partnership or joint venture known as D & H Steel Salvage Company (D & H). There was no written partnership agreement. Hoak and Addington merely agreed to share profits and losses from D & H on an equal basis. One of D & H's first transactions was to enter into a new contract with Liberty. Under the new contract and during 1974 and 1975 D & H collected all waste including slag from steel mills, and extracted from the waste any scrap metal. Liberty hauled the waste from the mills to the dump and any scrap from the dump to the place of its sale, collected the sale proceeds, deducted $2.00 per ton for hauling, kept 25 percent of the net proceeds, and distributed the remaining 75 percent of the proceeds to D & H. In D & H's day to day operations Hoak supervised the dump and salvage operation while Addington maintained the partnership permits and arranged the sales of the scrap to various steel mills. For about four or five months, part of which was in 1974 and part in 1975, Addington *260 was sick and unable to work. During this period his duties were performed by an employee of D & H. For the calendar years 1974 and 1975 D & H filed partnership returns on the cash basis with the Philadelphia Service Center. The returns reflected gross receipts for 1974 and 1975 in the respective amounts of $607,818.00 and $314,083.95. All parties agree that on the return for 1974 the gross receipts of D & H were understated by $210,909.97. The understatement is represented by sales made to Monongahela Iron and Metal Company, Essex Steel Corporation, Allegheny Sand, and Josh Steel in the amounts shown below: Monongahela Iron &
Metal Company
$203,613.64
Essex Steel Corporation
258.89
Allegheny Sand
5,276.94
Josh Steel
1,760.50
TOTAL
$210,909.97
In addition to the agreed omissions set forth above, we also find that during 1974 Monongahela received, issued weighbills, and paid D & H for scrap on nine different occasions in the total amount of $30,624.46. These receipts were also omitted on D & H's 1974 return. Consequently, the gross receipts of D & H for 1974 were understated by a total of $241,534.43 before any adjustment for an overstatement of *261 $2,163.05 which respondent concedes was made by D & H in its reported receipts. With this adjustment, the net understatement of D & H's gross receipts for 1974 is $239,371.38. Under the agreement between Hoak and Addington, one-half of the understatement is attributable to Hoak and one-half is attributable to Addington. The omitted 1974 receipts from Monongahela, totaling $234,238.10, were represented by 72 separate sales of scrap. At the request of both Hoak and Addington these sales were paid for by Monongahela in cash. One of the cash payments was received by Hoak alone, 61 Payments were received by Addington alone, and one was received by both Hoak and Addington. The record fails to disclose who received the other 9 payments, but Carol Mika, the bookkeeper for D & H, testified that she picked up some payments from Monongahela. All of the cash payments were made on the premises of Monongahela and were carried by the recipient to the office of D & H which was located in Doug's Motel where the cash was divided equally between Hoak and Addington, sometimes in the presence of Carol Mika, the bookkeeper of D & H, and/or Ruth Humphrey, another employee of D & H. D & H's records *262 for 1975 were destroyed before respondent commenced his audit of that year. [3] However, respondent's agents were able to reconstruct the 1975 receipts in the following manner. First, from the cancelled checks of third parties respondent was able to establish and the parties have stipulated that D & H had gross receipts in 1975 paid by checks in the total amount of $238,040.32. Secondly, from 18 written receipts signed by Addington for cash sales made by D & H to Monongahela, it was established and stipulated to by the parties that D & H had gross receipts paid by cash during 1975 from Monongahela which totaled $64,038.41. All of these cash payments were picked up by Addington. Finally, respondent noted that on the 1975 return D & H had deducted $61,940.00 from its $314,083.95 in reported gross receipts for the amount retained by Liberty under its agreement with D & H. Since it is agreed that D & H followed the practice of including in receipts the total amount collected by Liberty and then deducting out the 25 percent retained by Liberty as a commission or other expense, respondent added the $61,940.00 to the sales by check of $238,040.32 and the cash sales of $64,038.41 in order *263 to arrive at corrected gross receipts in the amount of $364,018.73. In this manner respondent correctly concluded that the gross receipts for 1975 were understated by at least $49,934.78 ($364,018.73 - $314,083.95). Under the original agreement between Hoak and Addington one-half of the understatement is attributable to Hoak and one-half to Addington. Hoak's Unreported Income
During 1975 Hoak sold scrap metal to Dart Cartage Company for $12,533.74. In payment for the scrap, Hoak received a check dated November 20, 1975 from Dart Cartage. The check was cashed or otherwise negotiated by Hoak on or before December 8, 1975. Although the check represented income to Hoak, it was not reported on his 1975 return. Addington's Unreported Income
In addition to being a partner in D & H, Addington owned and operated three other businesses during 1974 -- Doug's Construction, Doug's Motel, and Doug's Steel and Salvage Company (Doug's Steel). It is agreed that the gross receipts of two of these businesses, Doug's Steel and Doug's Construction, were understated on Addington's 1974 return *264 by the respective amounts of $84,471.50 and $126,779.39. Respondent concedes, however, that Addington is entitled to adjustments for bookkeeping errors in reporting the gross receipts of Doug's Steel and Doug's Construction in the amounts of $400.00 and $4,925.95, respectively. Carol Mika, the bookkeeper for D & H, prepared its partnership returns for 1974 and 1975. She went over each return with both Hoak and Addington. Carol Mika also prepared Addington's 1974 individual return and went over it with him. She also prepared the joint returns for Mr. and Mrs. Hoak for 1974 and 1975. She went over these returns with Hoak. At the time these returns were prepared and at the time she discussed them with Hoak and Addington, Carol Mika knew that the receipts for the cash sales made to Monongahela for D & H for both 1974 and 1975 were not reported on either the partnership or the individual returns. The omissions, however, were not mentioned by Mika, Hoak or Addington. On November 20, 1981, Addington pleaded guilty in the United States District Court for the Western District of Pennsylvania to willfully and knowingly attempting to evade and defeat a large part of the income tax *265 due and owing by him for 1974 by filing a false and fraudulent income tax return in violation of section 7201. On March 30, 1982 respondent mailed a statutory notice to Mr. and Mrs. Hoak in which he set forth his determination of the deficiencies and additions to tax with respect to their 1974 and 1975 tax returns. On August 11, 1982, respondent mailed a statutory notice to Addington in which he set forth his determination with respect to Addington's income tax return for 1974. OPINION Unreported Income of D & H
Hoak insists that he should not be charged with 50 percent of D & H's cash receipts from Nonongahela. In support of this contention he points to the uncontroverted fact that all of the cash receipts in 1975 and almost all of them in 1974 were picked up at Monongahela by Addington and insists that Addington only gave him between $10,000 and $15,000 of such receipts. Hoak also testified that he had no way of knowing in 1974 and 1975 the full extent of the sales to Monongahela or the amount of Monongahela's cash payments and therefore he did not know at that time how large his one-half interest in the payments was after subtracting the hauling charges and Liberty's *266 25 percent. The record, however, contains no evidence which tends to corroborate Hoak's testimony on this point. On the contrary, the record contains a great deal of evidence which tends to refute it. For instance, Harold Rice and James Sproul were employed in 1974 and 1975 by Addington as truck divers. They testified that they hauled scrap from D & H's dump to Monongahela on a regular basis, that Hoak often directed them to make the deliveries, and that Hoak frequently asked to see the weighbills that they received from Monongahela. Carol Mika, the bookkeeper for D & H, testified that in 1974 and 1975 she gave Hoak weekly reports of D & H's receipts, that on a few occasions she counted and divided the cash payments between Hoak and Addington, and that on several occasions she observed Hoak and Addington dividing the cash between themselves. Ruth Humphrey, another employee of D & H, testified that she had also observed Hoak and Addington dividing the cash payments in 1974 and 1975 and that she was hired by Hoak to make copies of the Monongahela weighbills and to deliver them to him weekly. Addington testified that usually Hoak accompanied him to Monongahela to pick up the cash *267 payments and if he did not, they would get together at Doug's Motel immediately after the payments were picked up and the cash would be devided in accordance with the terms of the partnership agreement. Furthermore, Hoak himself testified that during 1974 and 1975 he was in charge of the salvaging process, kept account of the scrap metal recovered at the dump, and saw the weighbills for the sales of the scrap. We are satisfied therefore from the record as a whole that Hoak knew generally, if not specifically, the extent of the scrap material being hauled to Monongahela and the amount that Monongahela was paying for it. We are also satisfied that all, or substantially all, of the cash payments were received and divided in the manner testified to by the other witnesses. In any event, we are dealing with the profits of D & H which is admittedly a partnership for tax purposes and each partner in a partnership is taxable on his distributive share of the partnership's income whether or not his distributive share is actually distributed. See . In fact the retention of partnership profits by one partner does not relieve the other *268 partner from including his distributive share of the partnership income in his gross income for the year earned by the partnership. See ; . Consequently, Hoak's contention is inapposite because under the circumstances of this case it does not matter whether he actually received his share of the cash receipts so long as such receipts were includable in D & H's partnership earnings for 1974 and 1975 as the parties have stipulated. Both Hoak and Addington contend that D & H is entitled to deduct from the cash received from Monongahela the 25 percent due to Liberty for hauling. However, their testimony that cash equal to 25 percent of each payment received by D & H from Monongahela was paid to Liberty is not supported by the record as a whole and especially by the testimony of Mr. Picone, the principal officer of Liberty, who stated that only two cash payments were ever made to him or his company. Respondent's agent also testified that he could find no evidence of any other such payments being made to Liberty or to Mr. Picone. Consequently *269 on this record we are unable to find that 25 percent of the cash receipts of D & H were paid over to Liberty. We conclude therefore that respondent's computation of the unreported income of D & H for both 1974 and 1975 is correct and that 50 percent of such unreported income is attributable to Hoak and 50 percent to Addington. Fraud
With respect to this issue we note at the outset that Addington pleaded guilty to having filed a false and fraudulent return for 1974 in violation of section 7201. This plea alone is sufficient to collaterally estop him from denying that he is liable for the addition to tax for 1974 provided by section 6653(b). , affg. a Memorandum Opinion of this Court, cert. denied ; , affg. a Memorandum Opinion of this Court; ; , affd. . Respondent, however, has the burden of proving by clear and convincing evidence that some part *270 of the underpayment of Hoak for each of the years was due to fraud. Section 7454(a); Rule 142(b). This burden is met if it is shown that Hoak intended to conceal, mislead, or otherwise prevent the collection of a tax known to be due. , cert. denied ; , affg. a Memorandum Opinion of this Court; . The presence or absence of fraud is a question of fact to be determined from the entire record. , affd. without published opinion . Fraud is never presumed but must be established by affirmative evidence. . It may, however, be proven by circumstantial evidence because direct proof of a taxpayer's intent is never readily available. The taxpayer's entire course of conduct may be examined to determine whether the fraudulent intent is present. ; *271 . A review of the record in this case clearly and convincingly establishes that: (1) D & H made numerous sales of scrap to Monongahela in 1974 and 1975; (2) Both Roderick C. Hoak and Douglas Addington requested that Monongahela pay cash for the scrap; (3) Monongahela's cash payments to D & H in 1974 and 1975 were not reported on D & H's partnership returns; (4) Both Hoak and Addington knew that the cash payments were taxable; (5) Both Hoak and Addington knew that the Monongahela payments were excluded from D & H's 1974 and 1975 partnership returns and from their personal returns; (6) Hoak failed to report on his 1975 return $12,533.74 he received during 1975 from the sale of scrap metal to Dart Cartage Company. Addington failed to report on his 1974 return gross receipts of two of his businesses, Doug's Steel and Doug's Construction, in the amounts of $84,471.50 and $126,779.39, respectively; and (7) Hoak fraudulently omitted taxable income from his returns for 1974 and 1975. Addington fraudulently omitted taxable income from his return for 1974. Consequently, both Hoak and Addington are liable for *272 additions to tax under section 6653(b) as determined by respondent. Statute of Limitations
Since a part of Hoak's income for 1974 was fraudulently omitted from the 1974 return an assessment for 1974 is not barred by the statute of limitations because the assessment can be made at any time under section 6501(c)(1). , affd. , cert. denied . To reflect the foregoing, as well as concessions made by the parties, Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, during the years in issue unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise provided. ↩
2. On January 9, 1984, respondent was granted leave to file an amended answer with respect to Douglas Addington. This amended answer increased the deficiency to $286,560 and the addition to tax under section 6653(b) to the amount of $159,522.↩
3. The record does not disclose how, why, or by whom the records were destroyed.↩